# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| TRISHA ROMANO, et al., | ) | CASE NO. 5:17-cv-668 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | |
| HUDSON CITY SCHOOL DISTRICT | ) | |
| BOARD OF EDUCATION, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court are the following fully-briefed[1] cross-motions for summary judgment: the motion of plaintiff, Trisha Romano ("Romano" or "plaintiff") (Doc. No. 73 ["Pl. Mot."]),[2] and the motion of defendants Phil Herman ("Herman"), Doreen Osmun ("Osmun"), Lisa Hunt ("Hunt") (collectively "individual defendants"),[3] and Hudson City School District ("Hudson Schools")

---

[1] In addition to the supporting and opposing briefs (which have their own exhibits), these two motions are also supported by several depositions (*see* Doc. Nos. 65-67, 69-72, 74, 77) and several sworn declarations (*see* Doc. Nos. 76, 84-95, 101) (which also have their own exhibits). It is no exaggeration to describe the record in this case as voluminous. Virtually every fact set forth herein as undisputed and supported by particular record references could also be supported by any number of additional references to the record. The fact that these additional references may not be cited does not mean that this Court has not considered them. Rather, in the interest of streamlining this opinion, the Court has cited to what it believes are the best record references. Furthermore, plaintiff's arguments are largely unsupported by citations to the record and, where there is a citation it is to Bates-numbered documents that are cross-referenced to neither the various document attachment numbers supplied by CMECF nor to the parties' exhibit numbers, including plaintiff's own exhibits. Under Rule 56, this Court has no duty to search the record to find what plaintiff does not herself point out with clarity. *See Neff v. City of E. Lansing*, 724 F. App'x 448, 450 n.4 (6th Cir. 2018) (citing *Wardle v. Lexington-Fayette Urban Cty. Gov't*, 45 F. App'x 505, 509 (6th Cir. 2002) (per curiam) ("[A] district court is not required to search the record to determine whether genuine issues of material fact exist when the non-moving party has failed to point them out."); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.")).

[2] Defendants filed a memorandum in opposition (Doc. No. 80 ["Def. Opp'n"], supported by Doc. Nos. 81-83) and plaintiff filed a reply (Doc. No. 102 ["Pl. Reply"]). Plaintiff moved to strike defendants' opposition (Doc. No. 97), which defendants opposed (Doc. No. 98). The motion to strike is **denied**.

[3] At all relevant times, Herman was the Superintendent of Hudson Schools; Osmun was the Assistant Superintendent; and Hunt was the Director of Human Resources. (Doc. No. 17, First Amended Complaint ["FAC"], ¶¶ 7-9.)

(collectively, "defendants") (Doc. No. 75 ["Defs. Mot."]).[4] For the reasons set forth herein, plaintiff's motion for summary judgment is **denied** and defendants' motion for summary judgment is **granted**.

## I. BACKGROUND

On March 30, 2017, plaintiff and her husband filed this lawsuit. By the time the motions for summary judgment were filed, the claims had been limited and Mr. Romano had been voluntarily dismissed. Currently, the only claims before the Court are the following, contained in the first amended complaint and brought solely by Romano: Counts II and V (state and federal age discrimination[5]); Count III (state aiding and abetting discrimination); and Counts IV and VI (state and federal retaliation).

### *Hudson Schools' Hiring Process*

Because this case involves claims of hiring discrimination, the Court will first describe the undisputed process used by Hudson Schools.

First, an application is completed online through a system called "AppliTrack," which is used by many different school districts. (Doc. No. 87, Declaration of Lisa Hunt ["Hunt Decl."] ¶ 6.) An applicant may upload any additional documentation that the applicant wants considered. Candidates usually upload resumes and reference letters, and sometimes cover letters, teaching licenses, portions of teaching portfolios, transcripts, and past evaluations that the applicant has received. (*Id.*) The application does not ask for an applicant's age or birthdate, and Hudson Schools does not collect this information on applicants. (*Id.* ¶ 7.) An applicant also takes an online

---

[4] Plaintiff filed a memorandum in opposition (Doc. No. 96 ["Pl. Opp'n"]) and defendants filed a reply (Doc. No. 99 ["Def. Reply"], supported by Doc. No. 100).

[5] Romano was born in 1974. (*See* Doc. No. 14-3.)

assessment, prepared and administered by Gallup, which produces a "Teacher Insight Score" that reflects a person's potential as a teacher. (*Id.* ¶ 8.)

At the K-3 level of Hudson Schools, the three building principals select the first round interviewees based on the application and Teacher Insight Score. They sometimes discuss their selections with Hunt, who emphasized that it is a collaborative process, where she never eliminates anyone the principals want to interview. Nor is there any set number of interviewees. (*Id.* ¶ 9.)

Before each round of interviews, an interview facilitator is selected. This person guides each interview based on a prescribed set of research-based interview questions and also cautions the interviewers about questions that cannot be asked (such as, an applicant's age). (*See* Doc. No. 87-1, Facilitator Instructions.) Interviewers have copies of these questions and typically take notes during the interview. (Hunt Decl. ¶¶ 10-11.)

For the first round of interviews, the K-3 principals conduct the interviews, after which they debrief by noting strengths and weaknesses of the interviewees, and thereafter reach a consensus about whom to invite for a second interview. (*Id.* ¶ 14.)

The second round interviews are conducted by a group of around ten seasoned teachers and administrators who represent different grade levels and areas of focus. (*Id.* ¶ 15.)[6] After the interviews, the entire committee meets to debrief and to reach consensus regarding which interviewee should be recommended to the Superintendent (and eventually, the Board of Education) for hire. (*Id.* ¶ 16.) If the committee cannot reach consensus, the Superintendent will conduct interviews and assist in making recommendations to the Board. (*Id.* ¶ 17.)

---

[6] Each interviewee is asked roughly the same set of questions. (*See, e.g.*, Doc. No. 87-10, Romano's Second Round Interview.)

*Undisputed Facts Relating to Romano's Applications*

Romano (currently 44 years old) is licensed to teach K-3 in the State of Ohio and currently holds a reading endorsement (which, notably, she obtained in March 2016 (*see* Doc. No. 73-14 at 1625[7])), a master's degree in education, and several semester hours of graduate education beyond her master's degree. (Doc. No. 96-1, Declaration of Trisha Romano ["Romano Decl."] ¶ 2.) She also has a bachelor's degree in communications, with a major in journalism. (*Id.* ¶ 3.)

When Romano was 38 years old, with her youngest child then enrolled in school, she first began to pursue a full-time teaching career. She applied for a teaching position in Hudson Schools for the 2012-13 school year; although she was interviewed, she was not hired. (*Id.* ¶ 7.) At the time, she was advised to gain teaching experience by seeking substitute teaching positions. (*Id.* ¶ 8.) Although Romano substituted in both Hudson Schools and Twinsburg Public Schools during 2012-13, by the end of that school year, she was performing short-term and daily substitute teaching exclusively in Hudson Schools. (*Id.* ¶ 11.)

In May 2013, Romano applied for another regular K-3 teaching position for the 2013-14 school year. She was 39 years old at the time. She was not selected for an interview and was not hired.[8] She was again told to "put in [her] time and get more experience." (*Id.* ¶ 20.) Romano claims that the person hired was far younger and less educated; but she acknowledges that the person had "more experience teaching than me." (*Id.*)

---

[7] All page number references are to the page identification number generated by the Court's electronic docketing system.

[8] For the 2013-14 school year, Romano applied for a total of eighteen teaching positions at six different school districts. She received no interviews as a result of any of those applications. (Doc. No. 73-27, Deposition of Trisha Romano ["Romano Dep."] at 2862.) Romano does not attribute this to any form of discrimination. (*Id.* at 2862-63.) Exhibit 4 to Romano's deposition lists all the jobs she applied for during the relevant time periods. (*See* Doc. No. 74-4.)

Hudson Schools employed Romano from January 13, 2014 to the end of the 2013-14 school year as a full-time long-term substitute for a second grade class whose teacher was on medical leave. (*Id.* ¶ 21.)[9] At the time, Romano was 40 years old. When Romano was hired for that position, the building principal, Jennifer Filomena ("Filomena"), wrote a letter to parents stating that she had "carefully selected" a substitute who was "familiar with the students as well as the routines and procedures" of the regular teacher, having already substituted in that classroom several times. (Doc. No. 73-7.) Filomena stated that they were "very fortunate to have found a wonderful person" to substitute, one who brought "enthusiasm and energy[]" to the position and who came "highly recommended[.]" (*Id.*) At the end of the year, Filomena evaluated Romano, assigning ratings of "proficient" and "distinguished" in the various areas of evaluation. (*See* Doc. No. 73-6.) Filomena also wrote a letter of recommendation for Romano. (*See* Doc. No. 73-8.)

Hudson Schools posted several K-3 classroom openings for the 2014-15 school year and Romano applied.[10] Romano did not yet have her reading endorsement and was not working to obtain it.[11] Hunt advised her that, as a result, she would not be selected for any interviews. (Romano Decl. ¶ 25; *see also* Romano Dep. at 2892 (admitting her lack of reading endorsement).) At the time, Romano did not attribute this to age discrimination,[12] but she has since changed her

---

[9] Romano herself approached Hudson Schools to offer her services as a substitute for the teacher. (*See* Doc. No. 74-7 at 3408.)

[10] For the 2014-15 school year, Romano applied for five regular teaching positions at two other school districts. No one interviewed her. (Romano Dep. at 2892-95.)

[11] *See* Ohio Revised Code § 3313.608(H). As explained by defendants: "This Ohio law is commonly known as the 'Third Grade Reading Guarantee' – even though it is labeled 'Fourth Grade Reading Capability' – because it requires school districts to identify students from K through 3 who are behind in reading and to provide help and support to ensure that these students are on track for reading success/promotion to fourth grade." (Def. Mot. at 3501 n.3.) "Part of this law requires third grade teachers, as of July 1, 2013, to meet certain reading criteria in order to be able to teach struggling readers in third grade." (*Id.*)

[12] In fact, when asked, Romano admitted that no one has *ever* made specific comments about her age. (Romano Dep. at 2913.)

mind because she is now not sure the person who was hired (Kristen LaScola, now Kristen Selner) had a reading endorsement. (Romano Dep. at 2911-13.) She does concede that, if LaScola had that endorsement, she would have met the qualifications for the teaching position. (*Id.* at 2913.) In fact, LaScola had plans to, and did, complete the requirements for her reading endorsement before the start of the 2014-15 school year, specifically, by July 2014. (Doc. No. 92, Declaration of Kristen Selner ["Selner Decl."] ¶¶ 3-5.)

For the 2014-15 school year, Hudson Schools hired Romano to continue as the full-time substitute teacher for the same second grade classroom where she had been teaching for the second half of the 2013-14 school year. (Romano Decl. ¶ 26.) The intent was that she would teach for the entire year. (*Id.* ¶ 28.) Hudson Schools assigned Romano a mentor (she had also had a mentor during 2013-14). (Romano Dep. at 3061-62.) Romano did not know whether mentoring was a standard policy for substitutes in Hudson Schools (*id.* at 2062), but Filomena confirmed that, although every new teacher receives a mentor, this was not standard practice for substitutes. (Doc. No. 73-20, Deposition of Jennifer Filomena ["Filomena Dep."] at 1939.) Hunt also confirmed that Romano had mentors and that she "needed . . . a lot of support, too much support" from them, as compared to other job candidates. (Doc. No. 73-22, Deposition of Lisa Hunt ["Hunt Dep."] at 2281.) During the first quarter of the 2014-15 school year, it became apparent to Filomena that Romano "was not seeing her struggling readers as often as she should be." (Filomena Dep. at 1939.) Filomena assigned a retired teacher to "help [Romano] complete her developmental reading assessments." (*Id.* at 1940.) Filomena also needed to assist Romano with "ideas for classroom management" (*id.* at 1941) and with "[r]estructuring her entire language arts period." (*Id.* at 1943.) Despite needing to provide this extra assistance to Romano, at the end of the 2014-15 school year, Filomena again wrote a letter of recommendation for Romano. (Romano Dep. at 2955.)

For the 2015-16 school year, Romano (age 41) again applied to Hudson Schools for a K-3 teaching position. (*Id.* at 2962.) Filomena recommended to the other principals (Beth Trivelli and Mark Levanthal) that Romano be given a first round interview. (Doc. No. 95, Declaration of Jennifer Filomena ["Filomena Decl."] ¶ 12.) After the interview, when the three of them debriefed, although they had several specifically-identified concerns, because Romano "had been long term substitute teaching and did well enough in the first round of interviews, the three . . . principals decided collaboratively to bring her back for a second round interview." (*Id*. ¶ 15.) In all, thirteen candidates advanced to second round interviews. (*Id*. ¶ 16.) After the group of ten interviewers conducted the second round interviews and debriefed, not a single one (including Filomena) recommended that Romano be hired, finding that "other candidates were better candidates." (*Id.* ¶ 21.)[13]

On May 15, 2015, Hunt and Filomena informed Romano in person that she would not be recommended for hire. (Romano Dep. at 2985-86.) On May 19, 2015, Romano sent an email to Hunt disputing the decision and asking that Hudson Schools reconsider. (Doc. No. 74-11, Def. Ex. 33 at 3417-18.)[14] Romano stated that "it appear[ed] to [her] the only logical explanation is that it

---

[13] Romano places great stock in the fact that "Filomena thought highly of [her] and recommended that [she] be hired as a regular teacher in 2015." (Romano Decl. ¶ 41.) But the record shows that, despite Filomena's *letter* of recommendation in support of Romano's application, in fact, following the interviews, Filomena actually did not recommend Romano. In addition, no other member of the committee recommended that Romano be hired.

[14] On the same day, Romano's husband, Matthew Romano, who was initially a plaintiff in this action and is an attorney, forwarded Romano's email to Phil Herman, the Superintendent of Hudson Schools. Mr. Romano and Herman knew one another from high school and college. They spoke personally the next day and, although Herman advised Mr. Romano that he would not discuss any candidate without that candidate being present, he agreed to review the hiring process to ascertain if anything was "out of line." (Doc. No. 86, Declaration of Phillip Herman ["Herman Decl."] ¶ 8.) Herman did not perceive the complaint as a claim of age discrimination. (*Id.*) Herman spoke with Hunt and the three elementary school principals who had conducted the first round interview. (*Id.* ¶ 10.) He also reviewed all the interviewers' notes from both rounds of interviews. (*Id.* ¶ 13.) He saw nothing amiss. (*Id.* ¶ 14.) Herman met with Hunt and Romano on June 4, 2015, operating on his assumption (based on his conversation with Mr. Romano) that Romano was merely seeking to understand why she had not been hired. Herman is aware that applicants often apply many times before they obtain a position, and they frequently want clarification and feedback so they can improve. (*Id.* ¶ 15.) The June 4th meeting was not adversarial and Herman thought the matter was resolved. (*Id.* ¶ 16.) Herman was surprised to hear a year later, when he encountered Mr. Romano at a Board of Education meeting, that Romano

is due to my older age." (*Id.* at 3418.) In Romano's view, the two younger persons who were hired were not as qualified as she. Hunt promptly responded, asking to set up a meeting with Romano. Romano accepted Hunt's offer and they met on June 30, 2015. (Romano Dep. at 3046-47; Hunt Decl. ¶ 44.) After this meeting, Romano applied for a position as an Individual Small Group Instruction Teacher ("ISGIT"). She was interviewed, but Hudson Schools ultimately selected three others, two of whom were over the age of 40. Romano does not claim that this decision involved age discrimination. (Romano Dep. at 3013.)

In all, Romano applied for at least eleven positions in seven other districts for the 2015-16 school year. One district interviewed her for a second grade position, but she was not hired. (*Id.* at 3079.) Romano accepted a Title I Tutor position at that same district and, therefore, did not continue as a substitute. (*Id.* at 3056-57.)

For the 2016-17 school year, Romano applied to Hudson Schools for several K-3 teaching positions, but was not interviewed or hired. In all, she applied for forty teaching positions at fifteen school districts for that school year. (*Id.* at 3066-76 and Ex. 4.) She applied for a second grade position at the school district where she worked as a Title I Tutor but, although she was interviewed in two rounds, she was not hired. (*Id.* at 3067-69.)

Romano did not apply to Hudson Schools for 2017-18 school year. She submitted six applications for regular teaching positions at four other districts. (*Id.* at 3109-12.) She interviewed for a third grade position at another district where she had worked as a Small Group Instructor, but

_____

believed she was not invited for an interview for the 2016-17 school year in retaliation for having previously raised age discrimination. (*Id.* ¶ 18.) Herman reviewed the hiring process yet again and, by letter to Romano dated August 29, 2016, supplied a copy of the district's Nondiscrimination and Equal Employment Opportunity Policy. He inquired whether she wished to file a formal complaint under the policy. Romano responded by letter dated October 14, 2016, and later confirmed that she would not be filing a complaint. (*Id.* ¶ 19.)

was not hired. (*Id*. at 3110-11.) She accepted an ELA Interventionist/RTI Coordinator position at another district for the 2017-18 school year. (*Id.* at 3109.)

## II. STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

"[T]he standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

> The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.

*Id*. (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987) (citations omitted)).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on*

*other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict[.]" *Id.* at 252.

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (finding that summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(3); s*ee also Street v. J.C. Bradford*

*& Co*., 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988))).

Under this standard, the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment motion. *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004) (citing *Anderson*, 477 U.S. at 247-48) (quotation marks omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## III. DISCUSSION

### A. Age Discrimination in Employment (Counts II and V)

Plaintiff alleges age discrimination under both federal and state law.[15] She asserts that defendants discriminated against her on the basis of age "by failing to hire her in 2014, 2015, and 2016, when she was over the age of 40, and by hiring new teachers under the age of 40." (FAC ¶¶ 94, 108.)

The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, makes it unlawful for an employer to "fail or refuse to hire" an individual "because of such individual's age[.]" 29 U.S.C. § 623(a)(1). Ohio law also prohibits age discrimination and such claims are "analyzed under the same standards as federal claims brought under the [ADEA]." *Wharton v. Gorman-Rupp Co.*, 309 F. App'x 990, 995 (6th Cir. 2009).[16]

---

[15] Defendants' arguments for summary judgment encompass both claims; plaintiff's argument for summary judgment addresses only the federal claim. Since defendants are entitled to summary judgment on both claims, plaintiff's failure to address the Ohio claim in her motion is irrelevant.

[16] Ohio has a complex statutory scheme for age discrimination claims. Ohio Revised Code Chapter 4112 "provides an election of remedy scheme which requires a plaintiff to elect one of the three sections, 4112.02, 4112.14 or 4112.99,

A plaintiff bringing an ADEA claim "must prove that age was a determining factor in the adverse action that the employer took against him or her." *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir. 1993) (citing *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 299-30 (6th Cir. 1990)). The Supreme Court has held that the ADEA does not permit "a mixed-motives" claim; instead, a plaintiff alleging a violation of § 623(a) must prove by a preponderance of the evidence that "age was the 'but-for' cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175, 177, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009).

*DeBra v. JPMorgan Chase & Co.*, No. 17-1411, 2018 WL 4212493, at *4 (6th Cir. Sept. 5, 2018).

Age discrimination may be established by either direct or circumstantial evidence. In this case, plaintiff offers the latter. Circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc)).

The Court applies the evidentiary framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) to analyze ADEA claims based on circumstantial evidence. "Under that framework, a plaintiff must produce enough evidence to establish a prima facie case of age discrimination, namely: '(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination.'" *DeBra*, 2018 WL 4212493, at * 4 (quoting *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002))).

Once the plaintiff establishes a prima facie case, a presumption of discrimination arises and "the burden of production shifts to the defendant to articulate a non-discriminatory reason for

under which to bring her age discrimination claims." *Goodyear v. Waco Holdings, Inc.*, No. 91432, 2009 WL 344993, at *8 (Ohio Ct. App. Feb. 12, 2009). Count II of the FAC cites both § 4112.14 and § 4112.99. Plaintiff has never elected between the two.

its action." *Burzynski v. Cohen*, 264 F.3d 611, 622 (6th Cir. 2001). If defendant articulates a non-discriminatory reason, the presumption is rebutted, and the burden shifts back to plaintiff to show that the reason was a pretext for age discrimination. *Id.* "This Circuit recognizes three ways for a plaintiff to prove that the employer's stated reason is pretextual: (1) the reason has no basis in fact, (2) the reason did not actually motivate the [adverse employment action], or (3) the reason was insufficient to motivate the [adverse employment action]. *DeBra*, 2018 WL 4212493, at * 4 (citing *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012)). At all times, "the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against [her]." *Id.* (internal quotations omitted).[17]

### 1. *Claims Against Individual Defendants*

Neither federal nor state age discrimination law permits recovery against individual defendants. The statutory age discrimination provisions apply only to an "employer," and

---

[17] Plaintiff argues at length in her motion for summary judgment that defendants are unable to establish that there was any "business necessity" for their hiring procedures. Plaintiff asserts that "[t]he [ADEA] proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." (Pl. Mot. at 1495.) *See Smith v. City of Jackson*, 544 U.S. 228, 244, 125 S. Ct. 1536, 161 L. Ed. 2d 410 (2005) ("employment criteria that are age-neutral on their face but which nevertheless have a disparate impact on members of the protected age group must be justified as a business necessity[]"). Plaintiff is applying the wrong standard. The "business necessity" standard applies in cases of disparate impact, not disparate treatment. Furthermore, plaintiff identifies no offending business practices, other than to complain that defendants "argue[] that [they were] entitled to exercise [their] business-judgment in the selection of job candidates." (Pl. Mot. at 1500.)

Relying on cases from the Tenth Circuit, plaintiff claims that "in certain circumstances, the fact-finder can reasonably regard the business-judgment as 'so idiosyncratic or questionable' that it could suggest 'a pretext for illegal discrimination.'" (*Id.* at 1500-01, quoting *Stanphill v. Health Care Serv. Corp.*, 627 F. Supp. 2d 1244 (W.D. Okla. 2008) and *Beard v. Seagate Tech., Inc.*, 145 F.3d 1159, 1169 (10th Cir. 1998).) Even accepting that as true, plaintiff fails to point to anything in this record to meet that test, unlike in *Stanphill*, where plaintiff could point to a handwritten note identifying "age, tenure, productivity[]" as concerns about hiring plaintiff, which a reasonable jury could find reflective of company policy, and unlike in *Beard*, where, although the court would not disturb the employer's *choice* of criteria for a reduction in force (plaintiff had claimed that if different criteria were used, she would have been selected), it did find that plaintiff had raised an inference of pretext (sufficient to create a jury question) by showing evidence suggesting that the employer had manipulated her performance evaluation to ensure that she would not meet the selection criteria.

individuals do not meet that definition. *See Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 404 & n.6 (6th Cir. 1997) (citing cases holding that, under Title VII, the ADEA, the ADA and similar statutes, individuals "may not be held personally liable"); *Hauser v. Dayton Police Dep't*, 17 N.E.3d 554, 558 (Ohio 2014) (stating that although Ohio's employment discrimination statutes "subject employers to vicarious liability, [they] do not expressly impose liability on individual employees[]").[18]

Thus, plaintiff's claim of age discrimination against each of the individual defendants is not cognizable and these defendants are entitled to summary judgment in their favor on Counts II and V.

2. *Timeliness*

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 5, 2017, alleging "continuing action" from June 1, 2014 to September 1, 2015. (*See* Doc. No. 14-3.) The charge asserted that Romano "applied for a teaching position in 2014-2016 with [Hudson Schools][,]" but "was not hired." (*Id.* at 167.) It further asserted she "was retaliated against and discriminated against because of [her] age, 40-43[.]" (*Id.*)

Under the relevant federal statute, a charge of discrimination must be filed "within 180 days after the alleged unlawful practice occurred[,]" or, in a state which has its own age discrimination procedure, "within 300 days after the alleged unlawful practice occurred[.]" 29 U.S.C. § 626(d)(1); 29 C.F.R. § 1626.7(a).[19]

---

[18] Romano does not contest this argument (*see* Pl. Opp'n at 4911), asserting that her claims against the individuals are brought only for aiding and abetting discrimination under Ohio Rev. Code § 4112.02(J).

[19] As already noted, *see* n.16, *supra*, under Ohio law a plaintiff must elect from among three statutes to bring an age discrimination claim. Claims under § 4112.02 must be filed within 180 days after the alleged discriminatory practice. *See* Ohio Rev. Code § 4112.02(L) (formerly (N)). Section 4112.14 contains no express statute of limitation, but courts have applied the six year limitation period for an action upon a contract not in writing or upon a liability created by statute. *Waco Holdings, Inc.*, 2009 WL 344993, at *8 (citing *Ahern v. Ameritech Corp.*, 739 N.E.2d 1184 (Ohio Ct.

The parties in this case entered into a Tolling Agreement effective November 1, 2016 through March 31, 2017. (Doc. No. 96-17.) Therefore, not counting that tolled period of time, 300 days prior to June 5, 2017 would be March 12, 2016. Plaintiff cannot seek relief for any age discrimination claim that arose prior to that date.

In her complaint, plaintiff alleges that she was discriminated against on the basis of her age because she was not hired for a teaching position for the 2014-15 school year (FAC ¶¶ 29-39) and for the 2015-16 school year (*id.* ¶¶ 40-63). But, the teaching positions for the 2014-15 school year were filled on or before August 18, 2014 (Hunt Decl. ¶ 21) and the positions for the 2015-16 school year were filled on or before August 17, 2015 (*id.* ¶ 37). Both of these dates are before March 12, 2016, and these claims are, therefore, time-barred.[20]

Although plaintiff's charge of discrimination characterizes her claims as "continuing," and she also advances this argument in her opposition brief (Pl. Opp'n at 4911-12),[21] the Supreme Court has made clear that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify[,]" and are not continuing violations. *Nat'l R.R. Passenger*

App. 2000); *see also* Ohio Rev. Code § 2305.07). The statute of limitation for claims brought under § 4112.99, which "creates an independent civil action to remedy any form of discrimination identified in R.C. Chapter 4112[,]" *Bellian v. Bicron Corp.*, 634 N.E.2d 608, 610 (Ohio 1994), seems to vary depending upon the type of discrimination. *Waco Holdings*, 2009 WL 344993, at *8. Here, plaintiff's Count II cites both § 4112.14 and § 4112.99. According to *Bellian*, an age discrimination claim under the more general § 4112.99 must comply with the statute of limitation in the specific statute, § 4112.02(L), that is, it must be filed within 180 days. Defendants do not seem to argue that any portion of plaintiff's Ohio age discrimination claim is time-barred even though plaintiff failed to *elect* between § 4112.14 and § 4112.99. The Court concludes, *sua sponte* that the latter claim is barred by the statute of limitations.

[20] Although plaintiff applied for positions during earlier school years, the record is not clear as to whether she attributes her failure to obtain those positions as being due to age discrimination. In any event, any such claim would also be time-barred.

[21] The Court also notes plaintiff's position that "the ADEA claims falling outstide [sic] the EEOC filing period are nonetheless related to the retaliation and failure to hire and that [d]efendants' actions comprising these claims were part of a pattern of 'continuing conduct' of and connected by [their] not providing [Romano] with a copy of the District's EEO Policy, let alone ever following the policy." (Pl. Opp'n at 4911.) The right protected under the relevant statutes is the right not to suffer discrimination and/or retaliation based on age, not the right to be supplied with a copy of any policy. Plaintiff cannot manufacture a claim out of either an alleged failure to provide her with a copy of the EEO Policy or an alleged failure to follow the policy.

*Corp. v. Morgan*, 536 U.S. 101, 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) (rejecting the notion of "serial violations").

### 3. *Burden-Shifting Analysis*

Even if plaintiff's claims of age discrimination against Hudson Schools were not time-barred, plaintiff would nonetheless fail in her burden of proof, as to both the federal and the state claims.

First, plaintiff cannot establish that she was "qualified" for any K-3 teaching position for the 2014-15 and 2015-16 school years. By her own testimony, she did not obtain her reading endorsement until March 2016, well after the hiring decisions were made for those two school years.[22] *See* Ohio Rev. Code § 3313.608(H) (describing the requirements for third grade teachers who teach struggling readers).[23]

Even assuming plaintiff could establish her prima facie case, defendants have articulated a legitimate, non-discriminatory reason for not selecting her for a full-time teaching position. The record includes the declarations of every member of the round two interview team.[24] Each confirms

---

[22] It appears that, with respect to the reading endorsement, plaintiff *may* have been qualified for a position during the 2016-17 school year, since she had obtained the endorsement in March 2016.

[23] Plaintiff claims that Hudson Schools' requirement that she have a reading endorsement was a pretext for discrimination because it is her belief that the younger person hired for a 2014-15 teaching position (i.e., Kristen LaScola Selner) did not possess the endorsement. The record shows that plaintiff is wrong in her belief about this person. In her declaration in support of her own summary judgment motion, Romano complains that she was not permitted to interview for a 2014-15 position because she did not have a reading endorsement, whereas LaScola was interviewed despite also lacking the endorsement. (Romano Decl. ¶¶ 25, 31.) But what Romano ignores is the fact that LaScola had already made plans to (and did) obtain the endorsement prior to the school year for which she was offered a position. Romano is prematurely mixing the concept of pretext into her discussion of the prima facie case. What she seems to be asserting is that a reading endorsement was not a real job requirement. But the record does not support this assertion.

[24] Hunt identified the members as "Rebecca Rice (K-3 Literacy Coordinator), Mark Leventhal (3rd grade principal), Beth Trivelli (K-1 principal), Jennifer Filomena (P-K, 2 principal), Michelle Bradley, now "Molchen" (3rd grade teacher and Math Content Facilitator), Christina Wooley (K-12 Curriculum Coordinator), Mary Beth DiPaola (2nd grade teacher and social studies content facilitator), Sandy Go[r]don (K inclusion teacher and K language arts content facilitator), Doreen Osmun (Director of Curriculum and Assistant Superintendent), and me (Director of Human Resources)." (Hunt Decl. ¶ 27.)

that he/she rejected Romano for well-articulated reasons completely unrelated to her age,[25] which each claims not to have known at the time.[26] (*See* Doc. No. 91, Declaration of Rebecca Rice ¶¶ 4-10, 16;[27] Doc. No. 88, Declaration of Mark Leventhal ¶¶ 4, 12-14;[28] Doc. No. 93, Declaration of Beth Trivelli ¶¶ 9; 10-14;[29] Filomena Decl. ¶¶ 9, 12-25;[30] Doc. No. 89, Declaration of Michelle

---

[25] Not a single interviewer mentions any lack of a reading endorsement. Further, that credential would likely have been dealt with at the initial screening level.

[26] Romano argues that each interviewer admits to having reviewed her application, from which, according to Romano, her age "can be easily determined[.]" (Pl. Opp'n at 4897; *see also* Romano's 2/17/15 Application (Doc. No. 87-7).) There is no high school graduation date in the application and dates of attendance at college are not indicative of age. The "Ex. 2" (*see* Doc. No. 73-4) that Romano references on page 4897 of her opposition brief is a collection of pages that she identifies as "Romano Employee Application." In fact, it is a collection of different documents (not all part of the employment application), the first few pages being an "Employee Information" sheet maintained by the Human Resources Department – which does, admittedly, contain her date of birth – but also contains a "hire date," showing that this document is *not* part of the actual application. There is not a scintilla of evidence that anyone on the interview committee had ever seen this information sheet. But, even taking as true Romano's assertion that they likely *knew* her age, no reasonable jury would conclude, in the face of the deluge of other evidence, that age was the "but for" cause of Hudson Schools' employment decisions.

[27] Rice had "big concerns" over Romano's "educational philosophy and understanding of literacy," and had "no indication" that Romano "is a learner." (Rice Decl. ¶ 4.) Romano's responses reflecting "whole-class lessons" were "a big red flag" to Rice because it was contrary to the workshop model used by Hudson Schools. (*Id.* ¶ 5.) Romano could not respond "with specifics" or "with sufficient detail" when asked how she might help a student who was behind in reading. (*Id.* ¶ 6.) Romano's answers regarding knowledge of her students "lacked insight and reflection[,]" and she did not exhibit knowledge of how to "motivate a student struggling behaviorally," seeming to suggest that there was "nothing for her to do as a teacher[.]" (*Id.* ¶ 7.)

[28] Leventhal was one of the three principals who intereviewed Romano in the first round. His notes reflected that her answers "were weak and raise[d] red flags." (Leventhal Decl. ¶ 11.) When asked why they should consider her above other applicants, Romano responded that "she earned it[,]" which Leventhal found "off-putting." (*Id.*) During second round, Leventhal found that Romano "lacked some specifics when answering questions, her answers were brief, and she had a flat affect." (*Id.* ¶ 12.) When asked how a teacher involves a student in his or her own learning, Romano responded: "Bridges and what not," referring to Hudson's math program. (*Id.*) In summary, he found "Romano's interview responses . . . not even close to demonstrating what [he] was looking for in a teacher." (*Id.*)

[29] Trivelli was another of the three principals who interviewed Romano in the first round. She also observed that Hudson Schools had hired *her* when she was 48 years old. (Trivelli Decl. ¶ 2.) After the first round interview, Trivelli did not believe Romano "would be a good fit . . . because of her lack of depth in balanced literacy strategies." (*Id.* ¶ 10.) Romano talked about using "worksheets" and "whole group activities[,]" which is not the model used in Hudson Schools. (*Id.*) Trivelli was also bothered by Romano's belief that she had "earned" being selected over another applicant. (*Id.*) After the second round interview, Trivelli believed Romano was "ok, but not outstanding." (*Id.* ¶ 14.) Her inability "to give specific examples of project based learning and to demonstrate an understanding of balanced literacy . . . did not compare well with other candidates, [including the two who were ultimately hired], who were very strong in showing what teaching literacy would look like in their classrooms." (*Id.*)

[30] Filomena was the facilitator of the first round interview for Romano, which included reminding the others not to inquire about age. (Filomena Decl. ¶ 13.) After this interview, Filomena noted "concerns with [Romano's] behavior/classroom management[.]" (*Id.* ¶ 15.) All three of the interviewers were "concerned with the amount of curriculum support that [Romano] would need in various areas including small group instruction, reading, and writing." (*Id.*) Filomena was bothered, as were the others, by Romano's sense of entitlement to the job. (*Id.*) Following

Bradley/Molchen ¶¶ 4- 5, 6;[31] Doc. No. 94, Declaration of Christina Wooley ¶¶ 6-9, 13;[32] Doc.

No. 84, Declaration of Mary Beth DiPaola ¶¶ 6-9, 14-15;[33] Doc. No. 85, Declaration of Sandy

the second round interview, Filomena did not think Romano had done as well as in the first interview. Romano's "interview responses were surface-level answers that lacked specificity and depth, and she failed to give concrete examples . . . even when asked[.]" Her demeanor was "formal and flat" and "missing the passion and enthusiasm for teaching" that was required. Filomena flagged this as a "big concern" because "behavior/classroom management issues can arise when a teacher does not have a commanding personality." Finally, Filomena was "concerned about [Romano's] depth of reading instructional practice, her small group instruction, and the level of curriculum support that she needed." (*Id.* ¶ 18.)

[31] Bradley/Molchen attests that she remembers Romano's responses as "being simply mediocre." (Bradley/Molchen Decl. ¶ 4.) She also "perceived [Romano's] attitude as presumptive, as if she felt it was a given that she would be hired." (*Id.*) She seemed "underprepared" and "was not engaging[.]" (*Id.*) To Bradely/Mochen, it seemed like Romano "would just get the job done but not necessarily give it her all or be the type of teacher that Hudson wants for its students." (*Id.*)

[32] Wooley had several concerns about Romano. First, "she did not demonstrate . . . her use of the workshop model" used by Hudson Schools, and second, "she did not reflect District philosophy with respect to classroom management." (Wooley Decl. ¶ 6.) Romano's answers did not reflect an ability to "tailor[] instruction to meet individual needs." (*Id.* ¶ 7.) Wooley noted that Romano did not align with Hudson Schools' vision with respect to use of the workshop model, a fact which surprised Wooley because Romano "had been working in the District as a long-term substitute teacher, had been trained in the math program used by the District, and had attended Professional Development in this area." (*Id.*) Wooley was concerned about Romano's use of worksheets, a practice not espoused by Hudson Schools. (*Id.*) Wooley found that Romano's "classroom management did not match District philosophy." (*Id.* ¶ 8.) She described using a "reward/penalty system" despite the fact that best practices show that such a system "does not work when dealing with children's impulses and needs." (*Id.*) Romano "answered questions generically without providing specifics that would show insight and reflection." (*Id.* ¶ 9.)

[33] DiPaola described Romano's behavior during the second interview as "on edge" and "defensive when responding to questions." (DiPaola Decl. ¶ 6.) DiPaola found Romano's answers to be lacking detail. For example, when asked how she involves students in their own learning, Romano responded that she would "make school interesting" and "make them love school." (*Id.* ¶ 7.) To DiPaola, this showed "lack of depth and lack of action plans." (*Id.*) DiPaola also attested to her interactions with Romano in her role as a long-term substitute, noting that "[w]henever someone gave her a suggestion on things to incorporate into her teaching, [Romano] responded as if the suggestion was an attack on her[.]" (*Id.* ¶ 8.) In DiPaola's view, Romano "cared more about making herself look better to others" than she cared about the students. (*Id.* ¶ 9.)

Gordon ¶¶ 5-8, 12;[34] Doc. No. 90, Declaration of Doreen Osmun ¶¶ 7-8, 10;[35] Hunt Decl. ¶¶ 28, 32.[36])

Romano fails to rebut any of these declarations or to produce even a scintilla of evidence that the decision not to interview and/or hire her had anything to do with her age, much less that it was the "but for" cause of Hudson Schools' failure to hire her. The record is clear that Romano simply did not meet the standard that Hudson Schools was looking for in the K-3 positions for which Romano applied. Plaintiff's "subjective view of her qualifications in relation to those of other applicants, without more, cannot sustain a claim of discrimination." *Hedrick v. W. Res. Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004); *see Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584 (6th Cir. 1992) (noting that plaintiff's subjective skepticism regarding the truth of an employer's representation does not raise a triable issue as to pretext).[37] Even though Romano claims that

---

[34] Gordon thought Romano was "thoughtful" and "caring" (Gordon Decl. ¶ 6), but she had concerns about her special education background and knowledge, noting that Romano had "never addressed students who were really challenged in terms of needing special education services." (*Id.* ¶ 7.) Notably, Romano gave a "superficial response" when asked about how best to meet the needs of a student who receives intervention services from a supplemental reading teacher. (*Id.*) Gordon doubted Romano's "ability to motivate students[,]" finding her "very flat . . . in terms of personality[.]" (*Id.* ¶ 8.) Gordon "questioned whether [Romano] was sufficiently dynamic to make learning fun and exciting for students which is expecially important in the K3 setting." (*Id.*) Gordon, who is 62 years old, found this trait to be "unrelated to age." (*Id.*)

[35] Osmun "had concerns" about Romano even before the second round of interviews. (Osmun Decl. ¶ 7.) Because her office was near Romano's classroom, she was able to hear and observe Romano in action when she was a long-term substitute. (*Id.*) She observed "noise levels not conducive to learning" and Romano "using a raised voice to manage the classroom." (*Id.*) Romano used "a lot of paper and pencil worksheets." (*Id.*) She "was often in the front of the room, not using proximity to manage the class." (*Id.*) During Romano's second round interview, she "completely ignored key components" of a language arts block in Hudson Schools and "simply gave a very surface-level response." (*Id.* ¶ 8.) Osmun was concerned that Romano "would need more support than usual in teaching and in classroom management." (*Id.*) She thought that Romano "did not demonstrate any constructive reflection on how to improve her instructional practices," and showed "a heavy reliance on a behavior management practice that Hudson has moved away from." (*Id.*)

[36] Hunt was the facilitator and scribe for the second round interview. (Hunt Decl. ¶¶ 28, 31.) She identified the interview team's concerns as including "classroom management, lack of early literacy skills, lack of flexibility to teach grades other than second grade, instructional practices, and level of support needed to teach reading, math, and writing, among other things." (*Id.* ¶ 32.)

[37] The Court also notes Romano's consistent reliance on evaluations of her teaching made by her principal, Jennifer Filomena, following her long-term substitute positions. (*See, e.g.,* Romano Decl. ¶¶ 23, 24, 34, 35, 40, 41, 42, 45.) She claims that this is proof that Hudson Schools never had any criticism of her teaching and, therefore, failure to hire

different selection criteria should have been used (for example, that she "had more classroom experience and education, extremely positive letters of recommendation, evaluations, and student growth scores[]" (Pl. Opp'n at 4914) or that she had "extensive familiarity and experience with the School District's specific curriculum and policies" (Pl. Mot. at 1477)), this Court does not serve as a "super-personnel department," second-guessing the facially-legitimate criteria[38] Hudson Schools used for selecting teachers. *Somogy v. S.E. Local Sch. Dist. Bd. of Educ.*, No. 5:06CV3047, 2007 WL 2572173, at \*8 (N.D. Ohio Aug. 31, 2007) (citing *Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134, 146 (2d Cir. 2006).[39]

---

her to a permanent position had nothing to do with her qualifications and everything to do with her age. But, although Filomena had a role in selecting candidates for review, she was not the sole (or final) decision-maker. Therefore, her judgment regarding Romano's competencies was but one person's view that was not shared by all the other interviewers, as reflected in their individual declarations. That said, in the end, Filomena found cause for concern regarding Romano's interview and did not recommend that Hudson Schools hire her because "other candidates were better candidates." (Filomena Decl. ¶ 21.)

[38] Hunt attested that, "[g]iven the number of applicants for each open position, over the years, Hudson has been developing best practices to hire the best and most qualified teachers for its students. Hudson's system has proven reliable as it is consistently rated as one of the top school districts in the State of Ohio and in the nation." (Hunt Decl. ¶ 5.) "[K]ey factors when hiring include an applicant's ability to build meaningful relationships with students; a desire to be reflective on the applicant's practice of teaching; an understanding of instructional practices; empathy; content knowledge of the subject being taught; and classroom management." (Herman Decl. ¶ 6.) The questions uniformly asked during the round two interviews are obviously aimed at ferreting out these factors. (*See, e.g.*, Doc. No. 87-10.) Herman confirmed that "[w]hile experience is helpful, there is no guarantee in Hudson that teachers who have worked as long-term substitutes are more deserving to be hired." (Herman Decl. ¶ 6.) Hudson School's hiring process "is a rigorous and collaborative process[,]" resulting in a recommendation "that is based on a consensus." (*Id.* ¶ 5.)

[39] Plaintiff makes much of the fact that she was a long-term substitute for Hudson Schools, and that she had been hired for that position without even being interviewed, which, in her view, "calls into question the necessity or validity or importance of the interviewing process[.]" (Pl. Mot. at 1478 n.1.) Plaintiff repeatedly suggests that, having been sufficiently qualified to serve as a substitute, she was automatically qualified to be a regular, full-time classroom teacher. But Lisa Hunt confirmed that "what [Hudson Schools] expect[s] of the teachers is absolutely different from a long-term sub and a classroom teacher that we are evaluating to hire." (Hunt Dep. at 1331.) Plaintiff also asserts that both Herman and Hunt testified that there was nothing in the other applicants' backgrounds, resumes, or professional experiences that set them apart from Romano. (Pl. Mot. at 1504.) But, Hudson Schools was free to choose from among qualified candidates, so long as the decision was not based on an impermissible factor, such as age. *Mansfield v. City of Murfreesboro*, 706 F. App'x 231, 239 (6th Cir. 2017) ("[E]mployers are generally free to choose among qualified candidates in making their employment decisions.") (internal quotation marks omitted); *Browning v. Dep't of Army*, 436 F.3d 692, 697 (6th Cir. 2006) (stating that a supervisor's decision to value certain criteria higher than others did not raise an inference of pretext); *Canham v. Oberlin Coll.*, 666 F.2d 1057, 1061 (6th Cir. 1981) ("The employer has . . . discretion to choose among candidates with different but equally desirable qualifications.").

Plaintiff has failed to meet her burden of establishing a material factual dispute with respect to her age discrimination claims. Therefore, Hudson Schools is entitled to summary judgment on Counts II and V.

### 4. Summary Conclusion on Age Discrimination Claims

Defendants' motion for summary judgment (Doc. No. 75) is granted with respect to Counts II and V; plaintiff's motion for summary judgment (Doc. No. 73) is denied with respect to those same two counts.

## B. Retaliation for Asserting Age Discrimination (Counts IV and VI)

Plaintiff alleges that she "engaged in protected activity by opposing unlawful age discrimination" (FAC ¶¶ 103, 114), and that "[i]n retaliation for [her] protected activity, [d]efendants failed to hire [her]" (*Id.* ¶¶ 104, 115). Romano alleges that she was advised by Hunt, on or about May 15, 2015, that she was not being hired for any of the 2015-16 school year openings for which she had applied. (Romano Decl. ¶ 49.) Romano "immediately disputed" the reasons offered for failing to hire her. (*Id.* ¶ 50.) In addition, on May 19, 2015, Romano "put [her] concerns about age bias into writing to Hunt, Director of Resources for all of Hudson Schools," and "asked to be reconsidered for one of the positions[.]" (*Id.* ¶ 54.) Romano alleges that, after she complained, another position came open in June 2015 and she asked Herman to be permitted to interview, but he advised that she "would not be considered[.]" (*Id.* ¶ 64.) Similarly, she was not hired for a position that opened in August 2015. (*Id.* ¶ 67.)

Romano further alleges that when teaching positions for the 2016-17 school year came open and she applied, defendants "failed to even interview [her] for any of the new teacher

openings, much less hire her." (FAC ¶ 74.) She alleges that this was "in retaliation for [her] prior complaints of discrimination . . . ." (*Id.* ¶ 77.)[40]

The ADEA prohibits employers from retaliating against a person for opposing or reporting age discrimination. 29 U.S.C. § 623(d). Ohio law is similar.[41] Ohio Rev. Code § 4112.02(I).[42] In evaluating a retaliation claim, the same *McDonnell Douglas* framework is applied as with claims of age discrimination.

"To establish a prima facie case of retaliation under either federal or Ohio law, a plaintiff must show that (1) she engaged in a protected activity, (2) the defending party was aware that the [plaintiff] had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and [the] adverse action." *Blizzard*, 698 F.3d at 288 (quotation marks omitted). An employee "may not invoke the protections of the Act by making a vague charge of discrimination." *Id.* That said, "[t]he burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

---

[40] In her complaint, Romano alleges that "at the very same time that [d]efendants were failing and refusing to interview or hire [her], Principal Filomena was specifically recommending [her] for special consideration in other school districts." (FAC ¶ 78.) But, in her subsequently filed declaration, she makes a directly contrary statement that "after [she] filed a lawsuit against [Filomena's] colleagues and complained of age discrimination, [she found] out [Filomena] is telling other prospective employers that [Romano is] not ready for a classroom teaching position." (Romano Decl. ¶ 72.) Since Filomena is not a party to this lawsuit, the Court does not construe this belated assertion as an allegation of retaliation, even though Romano characterizes it as such. Even if Romano's assertion about Filomena is taken as true, the age discrimination statutes do not protect against disloyalty, nor can Hudson Schools be liable for any such disloyalty on Filomena's part.

[41] As with the age discrimination claims, defendants' motion for summary judgment addresses both the federal and state claims, whereas plaintiff's motion addresses only the federal claim. Since defendants are entitled to summary judgment on both claims, plaintiff's failure to address the Ohio claim in her own motion is irrelevant.

[42] Plaintiff, however, bases Count IV on Ohio Rev. Code § 4112.02(J) (which does not seem applicable), § 4112.14 and § 4112.99. Once again, she fails to elect a remedy.

"In order to prevail on a claim of retaliation where the defendant has articulated a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff must prove not only that the defendant's proffered reason was a pretext, but that the real reason for the employer's action was intentional retaliation." *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008).

1. *Claims against Individual Defendants*

The discussion above regarding individual liability applies equally to any claim of retaliation for complaining about age discrimination. The individual defendants are entitled to summary judgment.

2. *Timeliness*

The discussion above regarding timeliness of any ADEA age discrimination claim applies equally to any ADEA claim of retaliation.

The timeliness of any retaliation claim based on Ohio law is complicated by plaintiff's failure to elect her statutory remedy (as discussed above) *and* by her citation to Ohio Rev. Code § 4112.02(J) (which does not appear to apply) rather than Ohio Rev. Code § 4112.02(I) (which is the section that prohibits retaliation).

Defendants argue that the state retaliation claim is barred as to any allegations occurring before May 5, 2016, which, taking the Tolling Agreement into account, is 180 days before the complaint was filed.

Given plaintiff's failure to meet her burden of proof on the merits of her claim, the Court will not further evaluate any question of timeliness.

### 3. *Burden-Shifting Analysis*

Plaintiff is unable to establish a prima facie case of retaliation. She claims that she complained of age discrimination (*i.e.*, engaged in protected activity) on or about May 19, 2015,[43] and that, thereafter, in June and August 2015 (when additional positions for the 2015-16 school year allegedly opened) and again during the hiring season for the 2016-17 school year, she was not interviewed, much less hired, in retaliation for having complained. But Romano fails to establish "causation" – which is necessary to make out a prima facie case of retaliation.

"To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the *likely reason* for the adverse action." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (internal quotation marks omitted) (emphasis added). The only evidence Romano has to rely upon is temporal proximity, which, by itself, is insufficient. *Id.* at 334 ("'temporal proximity alone does not support an inference of retaliatory discrimination in the absence of other evidence'" (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000))).

Plaintiff tries to assert that all of the relevant decision-makers knew of her complaint of age discrimination as a result of Herman's investigation into the hiring procedures undertaken after Romano's husband made inquiry on May 19, 2015. (Pl. Opp'n at 4917.) She claims that Herman "made it his business to inform [Hunt, Osmun, Filomena, and Levanthal,]" whom she refers to as "the hiring committee[.]"(*Id.*) But, to the extent these individuals may have served as a "hiring committee," their recommendations, at least with respect to the 2015-16 school year, were made

---

[43] The Court is assuming for sake of this analysis that Romano's passing email reference to age as a possible factor in the hiring decision (*see* Doc. No. 74-11 at 3418) is sufficient to qualify as "protected activity."

*prior* to any complaint about age discrimination. In fact, it was their recommendations that triggered the complaint.

But, even if the Court were to assume, for the sake of argument, that plaintiff had established a prima facie case, Romano fails to establish that the legitimate, non-discriminatory reason given by Hudson Schools for not interviewing and/or hiring her – namely, her poor performance during prior interviews – was a pretext for unlawful retaliation. A plaintiff can demonstrate pretext "by showing that the reason[] (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) [was] insufficient to motivate the employment action." *McKinley v. Skyline Chili, Inc.*, 534 F. App'x 461 465 (6th Cir. 2013); *see also DeBra v. JPMorgan Chase*, *supra*.

It might be different, on summary judgment, if plaintiff had not already been rejected for full-time teaching positions in Hudson Schools several times *before* she raised the issue of age discrimination.[44] In light of Romano's prior interviews, Hudson Schools' rejections of her applications *after* May 2015 are not evidence of retaliation,[45] but only evidence that Romano had already been judged inadequate to meet the standards of Hudson Schools for a full-time teacher.

---

[44] The mere fact, if it is true, that Filomena may have continued to recommend Romano to other school districts is not proof of anything, other than that Filomena was willing to recommend Romano for interviews in other districts, even though she had determined in the end that other candidates who had applied to Hudson Schools were better candidates than Romano.

[45] In her opposition brief, plaintiff claims that, "when eight positions opened up in 2016, . . . [f]or the first time in four straight school years, Hudson Schools did not interview or hire Plaintiff for a position and her qualifications had nothing to do with the decision." (Pl. Opp'n at 4918.) She claims this "was a product of the complaints [she] made in 2015 and [a] confrontation plaintiff's son had with Herman in March 2016 at a function attended by plaintiff and her son just prior to the posting of the 2016/2017 positions, [when] Plaintiff's son asked Herman why he did not hire Plaintiff. This incident was then likely reported to Osmun." (*Id.*, citing "Ex. 63".) There is insufficient temporal nexus between a May 2015 complaint and the alleged incident in March 2016 to establish any retaliation. To the extent any incident occurring in March 2016 *may* have been temporally close enough to suggest retaliation had there been protected activity, plaintiff's son's question to Herman does not fit that category. Further, the citation to "Ex. 63" in support of plaintiff's argument is useless, since Ex. 63 (Doc. No. 96-26) is a 31-page document and plaintiff has failed to supply a pinpoint citation. This is characteristic of many of plaintiff's citations in her briefing. As already pointed out, the Court has no duty to search the record to ascertain plaintiff's arguments or to locate her evidence.

Indeed, Romano cannot use this rejection to establish pretext for retaliation under the test set forth in *McKinley*, *supra*, because the record shows that *none* of the applicants who were interviewed in 2015, but were not hired, were considered for re-interviews at later dates and, in particular, for positions for the 2016-17 school year. (Osmun Decl. ¶¶ 15, 16.)

     *4.    Summary Conclusion on Retaliation Claims*

Defendants' motion for summary judgment (Doc. No. 75) is granted with respect to Counts IV and VI; plaintiff's motion for summary judgment (Doc. No. 73) is denied with respect to those same two counts.

## C.    Aiding and Abetting Age Discrimination (Count III)

Because Romano cannot establish either age discrimination or retaliation, the claim of aiding and abetting the same cannot withstand summary judgment and need not be further analyzed.

Defendants' motion for summary judgment (Doc. No. 75) is granted with respect to Count III.[46]

---

[46] Plaintiff did not seek summary judgment on Count III.

**IV. CONCLUSION**

For the reasons set forth here, defendants' motion for summary judgment (Doc. No. 75) is granted and plaintiff's motion for summary judgment (Doc. No. 73) is denied. This case will be closed by separate judgment entry.

**IT IS SO ORDERED**.

Dated: September 20, 2018

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**